UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CHARLES BRYANT,

                          Petitioner,

                                                    **MEMORANDUM & ORDER**

          -against-
                                                    08 CV 4666 (RJD)


HAROLD GRAHAM , Superintendent,
          Auburn Correctional Facility,



                          Respondent.
------------------------------------------------------------x
DEARIE, Judge.

          Petitioner Charles Bryant, currently serving terms of twenty-five years and twenty-five

years to life on his convictions of robbery, intentional murder and felony murder, following a

trial at which he testified, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as

amended by the Anti-terrorism and Death Penalty Act of 1996.

          Petitioner's principal claim is that his rights under the Confrontation Clause were violated

when an officer was permitted to testify about the differences between petitioner's confession

and the confession of a non-testifying co-defendant, and when the prosecutor was allowed to

elicit other references to the fact that the non-testifying co-defendant had implicated petitioner.

Petitioner also claims he was denied due process by certain of the prosecutor's remarks during

summation and by the trial court's imposition of consecutive sentences for robbery and

intentional murder.

          For the reasons set forth below, the application is denied and the petition is dismissed.

## BACKGROUND

The trial revealed a grisly, senseless and tragic crime.  On February 13, 2004, petitioner completed his school day as a tenth-grader at Forest Hills High School, shopped for groceries with his buddy Nayquan Miller, and by evening, was arranging a Chinese food take-out order, but not for the food.  Petitioner wanted new Air Jordan sneakers, which cost $110 a pair, and along with his friend Miller and a third individual, William Capehart, decided that an easy way to get the money was to rob a delivery person.

Eighteen year-old Huang Chen had the misfortune to be that delivery person.  When he arrived at Miller's seventh-floor apartment with the food, petitioner and his accomplices not only robbed him, but beat his head and body with a baseball bat and hammer, and then killed him by stabbing him in the hands and chest.  They then wrapped Chen's body in a bedroom blanket, brought it down the elevator in a shopping cart, placed it in the trunk of Chen's own double-parked delivery car, and drove to nearby Brookville Park, where they then dragged Chen's body onto a footbridge and dumped it in a pond.  Petitioner, Miller and Capehart also set fire to a bundle of evidence, including the bat, the hammer, the blanket and their own bloodied clothing, all of which police recovered in a nearby schoolyard trash bin.

Chen had been carrying only $80 at the time, and his killers did not even take all of it because they did not want the bills that had been bloodied in the attack.

Petitioner was arrested within 24 hours of the killing.  After being Mirandized and waiving his rights, petitioner was interrogated by Detectives Hendrickson and Koenderman, and confessed.  At trial Hendrickson testified to the contents of the two separate statements that petitioner made; the first was in Henderson's hand, the second in petitioner's.[1]

---

[1] Hendrickson testified that he obtained the first statement by asking questions of petitioner and then writing down what petitioner said.

2

In the first statement, petitioner furnished a detailed chronicle of the crime, from its planning through the attempt to conceal it. Petitioner also addressed his particular role: initially he stood as lookout while Chen arrived; after Chen was struck with the bat, petitioner dragged him from the hallway into Miller's apartment; petitioner also gathered up the cash that Chen threw to the floor while being beaten; and petitioner turned up the volume on a piece of audio equipment inside Miller's apartment to drown out Chen's screams. It was Miller, however, who stabbed Chen, both in the ribs and the hand, but petitioner participated fully in the ensuing disposal of the body and evidence.

Approximately an hour later, petitioner stated that he had more to say, and in a supplemental statement, he explained that in his first statement he had misidentified one of the two codefendants.[2] In this second statement petitioner also clarified his role in the killing: in the first statement, he stated that he turned up the radio so that no one could hear Miller stabbing the victim; in the supplement, petitioner admitted that he too stabbed the victim, and explained that although he did intend to rob Chen, he did not intend to kill him.

Petitioner's account was corroborated by the discovery of Chen's body where petitioner said it had been dumped and by medical evidence describing the nature of the injuries to Chen and the cause of death. The state also called an individual, one Joshua Kahilu, who testified that petitioner had told him, the day after the killing, that he (petitioner) and his friends had killed someone the day before; Kalihu also testified that petitioner asked him whether a body dumped in the water returns to the surface. Additionally, forensics confirmed that it was Chen's blood

---

[2] In his first statement, petitioner said that he planned and carried out the crime with Nayquam Miller and Teddy Marcelin. In his second statement, petitioner said that the third person involved was not Marcelin but an individual with the street name "Hits," and that he had lied about this detail in the first statement because he was afraid "Hits" would retaliate against him or his family. "Hits" is co-defendant William Capehart.

3

that had been found on a pair of boots belonging to petitioner that police obtained from petitioner's home the day after the killing.

Petitioner testified in his own defense, and asserted that he was innocent.  In denying that he had confessed, petitioner claimed that the first of his statements was a document that the police drafted, without input from him, and that the second of the statements was his transcribing of what officers dictated to him.  (The particulars of petitioner's testimony on this subject and the related portions of the record are addressed in detail below in the discussion of petitioner's confrontation clause claim.)

The jury found petitioner guilty of one count of intentional second degree murder (N.Y. Penal Law § 125.25[1]), one count of second degree felony murder (N.Y. Penal Law § 125.25[3]), one count of first degree robbery (N.Y. Penal Law §160.15[1]), and one count of tampering with physical evidence (N.Y. Penal Law §215.40[2]).   The court sentenced petitioner to indeterminate prison terms of twenty-five years to life on each of the murder counts and a determinate term of twenty-five years on the robbery count, all terms to run concurrently *except* that the terms for intentional murder and robbery were to run consecutive to each other.[3]

The Appellate Division, Second Department, unanimously affirmed petitioner's conviction, rejecting each of the nine claims that petitioner raised there.  See People v. Bryant, 39 A.D.3d 768 (2d Dep't 2007).  The New York Court of Appeals denied petitioner's application for leave to appeal.  People v. Bryant, 9 N.Y.3d 990 (Nov. 20, 2007).

---

[3] Miller eventually entered a plea of guilty to second degree murder and was sentenced to twenty-five years to life.  William Capehart, tried separately, was convicted of second degree murder and sentenced to a term of 51 ⅓ years to life.

## DISCUSSION

I. **AEDPA**

Under AEDPA, habeas relief is available only if the challenged state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). A "legal principle is 'clearly established' within the meaning of [Section 2254] only when it is embodied in a holding of [the Supreme] Court," Thaler v. Haynes, __ U.S. __, __, 130 S. Ct. 1171, 1173 (2010), "as opposed to the dicta" of the Court's decisions, Williams v. Taylor, 529 U.S. 362, 412 (2000), or the holdings of federal appellate courts. Carey v. Musladin 549 U.S. 70, 74 (2006). "A state court decision involves an 'unreasonable application of' federal law 'if it correctly identifies the governing legal principle but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case.'" Rivera v. Cuomo, __ F.3d __, 2011 WL 3447445, *3 (2d Cir. Aug. 9, 2011) (internal citations omitted).

As the Supreme Court recently emphasized,

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." . . . Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." . . . Rather, that application must be "objectively unreasonable." . . . This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. . . . AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," . . . and "demands that state-court decisions be given the benefit of the doubt" . . .

Renico v. Lett, __ U.S. __, __, 130 S. Ct. 1855, 1862 (2010) (internal citations omitted).

In sum, to show that he is entitled to habeas relief, petitioner must do more than merely convince me, in my independent judgment, that the state appellate court erred in rejecting one or

more of the claims he raises here.  Rather, he must show that the state appellate court

*unreasonably applied clearly established federal law* with respect to at least one of his claims.

See Watson v. Greene, 640 F.3d 501, 503 (2d Cir. 2011).

As set forth below, petitioner has failed to meet this formidable burden.

## II.    PETITIONER'S CONFRONTATION CLAUSE CLAIM

### A.    Context

Petitioner's position at trial, as developed principally during his own testimony, was that

the first of the statements offered as his confession was drafted by the police without input from

him, and that the second, although written in his hand, was dictated to him by police.

The stage was set, however, during the defense opening statement, when counsel first

introduced both the general theme of coercion and the claim that the confession the police had

already obtained from Miller was the source from which police allegedly derived the statement

attributed to petitioner:

> The evidence will show that when my client was in the precinct, by
> himself, without his mother, without his father, in a room with two
> seasoned New York City detectives, after those detectives had
> already arrested Nayquan Miller, after those detective had already
> been to all three crime scenes, after those detective has a written
> statement from Nayquan Miller, after all of that [,] later on that
> day, the detectives in their own handwriting wrote a statement that
> [petitioner] signs. . . . [i]t's not the writing of a sixteen year old
> kid.  What it is, is the signature of a sixteen year old kid. (T. 250-
> 51).

During his cross-examination of Detective Hendrickson, defense counsel returned to the

theme of derivation, asking: "Isn't is true [that] when you were writing [petitioner's] statement

you had Mr. Miller's statement right next to his?" (T. 512.) (Henderson answered the question

in the negative).

Understandably, the theme resurfaced during the prosecution's re-direct of Hendrickson:

> Now, Detective on cross examination by defense counsel he made
> reference to the facts, and asked you whether or not you had
> Miller's statement with you when you were interviewing the
> defendant. . . . Does the written statement of Miller mirror the
> defendant's written statement or are there factual differences
> contained in those statements? (T. 538.)

Defense counsel did not object, and Hendrickson replied that indeed there were factual differences. There was no re-cross.

When petitioner testified and addressed the subject of his two statements, he sought to advance the themes of coercion and derivation introduced earlier. On the subject of coercion, petitioner testified that he felt pressured because Hendrickson said he "wanted to hear [his] side of the story [be]cause he told me he already heard Nayquan Miller['s] side of the story," and also that he felt scared because Hendrickson shouted at him and hit him repeatedly. It is for these reasons, petitioner claimed, that he felt he had no choice but to sign the first of the statements (the one written in Henderson's hand) and to write, at Henderson's direction, the second (the one in his own hand). [4]

Petitioner also advanced, however, a specific though implied claim that the first statement was derived from Miller's. He testified that while Hendrickson was writing his statement, he "was just looking" back at him. His direct continued as follows:

Q.    When [Hendrickson] was writing, were you saying anything to him?

A.    No, I wasn't.

Q.    What were you doing?

---

[4] On the subject of his alleged innocence, petitioner testified that Miller and Capehart told him they wanted him to help them rob someone but that he refused. He testified that he left Miller's apartment before the Chinese food was delivered and went home; that later in the evening he telephoned Miller, who told him about the killing and the disposal of the body; and that the following day he told Joshua Kalihu that *his friends* had killed someone.

> Now, Detective on cross examination by defense counsel he made
> reference to the facts, and asked you whether or not you had
> Miller's statement with you when you were interviewing the
> defendant. . . . Does the written statement of Miller mirror the
> defendant's written statement or are there factual differences
> contained in those statements?  (T. 538.)

Defense counsel did not object, and Hendrickson replied that indeed there were factual
differences.  There was no re-cross.

When petitioner testified and addressed the subject of his two statements, he sought to
advance the themes of coercion and derivation introduced earlier.   On the subject of coercion,
petitioner testified that he felt pressured because Hendrickson said he "wanted to hear [his] side
of the story [be]cause he told me he already heard Nayquan Miller['s] side of the story," and also
that he felt scared because Hendrickson shouted at him and hit him repeatedly.  It is for these
reasons, petitioner claimed, that he felt he had no choice but to sign the first of the statements
(the one written in Henderson's hand) and to write, at Henderson's direction, the second (the one
in his own hand). [4]

Petitioner also advanced, however, a specific though implied claim that the first statement
was derived from Miller's.  He testified that while Hendrickson was writing his statement, he
"was just looking" back at him.  His direct continued as follows:

Q.      When [Hendrickson] was writing, were you saying anything to him?

A.      No, I wasn't.

Q.      What were you doing?

---

[4] On the subject of his alleged innocence, petitioner testified that Miller and Capehart told
him they wanted him to help them rob someone but that he refused.  He testified that he left
Miller's apartment before the Chinese food was delivered and went home; that later in the
evening he telephoned Miller, who told him about the killing and the disposal of the body; and
that the following day he told Joshua Kalihu that *his friends* had killed someone.

A.      I was just sitting there staring at him, wondering what's going on when he was writing.

The line of questioning continued:

Q.      . . . what was [Hendrickson] doing?

A.      He was writing.

Q.      And did he have anything else in his hand?

A.      No he did not.

Q.      Did he show you anything?

A.      Yes he did.

Q.      What did he show you?

A.      Nayquan Miller's statement.

Q.      Did you read it?

A.      No, I did not.

Q.      And what was he doing with Nayquan Miller's statement?

A.      I don't know. (T. 855.)[5]


During cross-examination, the following occurred:

Q.      By the way, did Detective Hendrickson tell you that Nayquan Miller was in the room next door?

A.      Yes.

Q.      Did Detective Hendrickson tell you that Nayquan Miller had implicated you?

---

[5] Petitioner further testified that Hendrickson left the room, returned, and then made him (petitioner) re-write the statement in his own hand as Hendrickson dictated it, and that only after all this was completed did he sign the Miranda waiver.

In response to the defense objection, the prosecution stated that the fact was being elicited "not for the truth" but "[s]trictly for state of mind," the objection was overruled, and the question re-posed:

> Q.    Did Detective Hendrickson tell you that Nayquan Miller said that you were involved in this?
>
> A.    Yes, he did.
>
> Q.    He did?
>
> A.    Yes. (T. 969-71)

At the close of petitioner's cross counsel renewed the objection:

> You allowed a question of my client, specifically Mr. Leventhal asked him did Detective Miller tell you that Nayquan [Miller] had implicated him in this murder, I believe that that question . . . violated my client's right to confrontation . . . because it's in the back door, the prosecutor just got in testimony that Nayquan Miller said that he [petitioner] committed this crime and I'm going to move for a mistrial. (T. 991)

The trial court ruled as follows: "That's denied. Strictly to show state of mind, not for the truth of it." (T. 992). The court did not deliver, nor did the defense request, a special instruction to the jury relating to this portion of testimony.

The prosecution announced its intention to call Hendrickson's partner, Detective Koenderman, who was present throughout the interrogation of petitioner, as a rebuttal witness. The state's objective, in the prosecutor's words, was "to discredit" what it characterized as "[defense] counsel's claim that the use of Nayquan Miller's statement was a template for the creation of [petitioner's] statement," and it wished to achieve this objective by asking Koenderman to highlight the differences between the two confessions. Defense counsel argued that petitioner's coercion claim was not *limited* to a claim of imitation, but did not deny that imitation was a component theme. Counsel noted, for example, that "if [the court] listen[s] to

9

my cross-examination it wasn't *only* Nayquan Miller's statement that [Hendrickson] had when

he wrote [petitioner's] statement . . . it was his entire investigation through the whole day." T. at

877 (emphasis added). Counsel also asserted that "[i]t is a little disingenuous for [the

prosecution] to say [that] the *only* reason I would argue he was able to write my client's full

statement is because of what Nayquan Miller told him. Yeah, it was partly what Nayquan Miller

told him, but it was also partly what his investigation had turned up." T. at 878.

The trial court ruled as follows:

> I will allow the People to elicit on their rebuttal case the
> differences . . . between statements allegedly made by Mr. Miller
> and by [petitioner]. The Court will not allow the People to
> introduce the written statement of Nayquan Miller. The Court will
> also deliver a curative instruction as to the limited purpose of the
> introduction of this evidence.

The trial court issued the following instruction before Koenderman began his testimony:

> The Court is going to allow the People to introduce some evidence
> regarding alleged statements made by the codefendant. . . The
> testimony is not being admitted for the truth. That is, they have
> not been admitted for the purposes of establishing what happened
> before, during and after the [m]urder in this case. These
> statements . . . will be in evidence for only a limited purpose . . . to
> rebut [petitioner's] testimony and [petitioner's] contention that his
> own statements were coercively obtained and derived from
> Nayquan Miller's statement. The evidence has been offered for
> that purpose alone and no other. . . . I charge you that you may not
> and must not consider the evidence which you are about to hear . . .
> to establish the truth of what is contained in those statements.

Koenderman then proceeded to testify to certain differences between the two confessions.

By way of example, petitioner had said that Miller accompanied him to Key Food to buy food to

make tacos, whereas Miller said that they went to Key Food but that they had no money to

purchase anything; petitioner had said they came up with the idea of robbing someone because

they needed $110 to buy new Air Jordan sneakers, but Miller had not mentioned the sneakers; and it was only petitioner who initially concealed the role of Hits (Capehart) by placing Teddy Marcelin at the scene, whereas Miller made no mention of Marcelin.

The defense engaged in a vigorous cross-examination of Koenderman aimed at undermining his capacity to recall in general, as well as his claimed capacity to recall the two confessions in sufficient detail to opine upon their differences.  Miller and petitioner had been interrogated within hours of each other on the day following the crime, and defense counsel walked Koenderman through each moment of that day, pressing him on not only the particulars of the two interrogations but also on a conversation he had had with Miller, in a police vehicle, while Miller was directing him to the location of Chen's body. [6]

The following excerpt is representative of the cross:

Q.      . . . so . . . from the time you got to the 113th precinct to the time you first spoke to Nayquam Miller . . did you leave? Did you go anywhere?

A.      Yes.

Q.      Where'd  you go?

A.      We took Nayquan Miller out to Brookville Boulevard.

Q.      That was before his written statement?

A.      Yes.

. . .

Q.      And so you were speaking with him in that car, correct?

A.      Yes, I was.

Q.      And you were speaking with Nayquan Miller at about what time?

---

[6] Miller was arrested during the overnight, when Chen's worried family re-traced Chen's route that evening and summoned the police to Miller's apartment.  After police spoke with Miller's mother and explained to her the need to find the victim, she spoke to Miller, and the trip to Brookville Park followed.

A.     It was after 8:00

Q.     . . . Now, did you take any notes with respect to your conversation with Nayquan Miller when  you were in the car with him?

A.     No, I was driving.

Q.     Okay. Did you ever . . . come back to the precinct and write down what he told you?

A.     No.

. . .

Q.     Okay.  So you went to Brookville Park and then there came a time that you came back to the precinct, right?

A.     Yes.

Q.     And then you - - - that's when Nayquan Miller gave you his written statement, right?

A.     Correct.

Q.     Okay.  That written statement ended at 11:25, right?

A.      I would have to see it.

Q.     Okay.  Now you still were --- after Nayquan Miller's written statement . . . you still were with Nayquan Miller, right?

A.     Yes, I was with him.

Q.     Okay.  Did you –after that written statement, did you write down the things that he told you?

A.     No.

Q.     . . .So when [the prosecution] just asked you if [petitioner's statement] is different than any written or oral statement tha[t] Nayquan Miller ever gave you, really don't remember everything as you sit here today [sic] what Nayquan Miller told you, right?"

A.     Specifically, if you asked me if he mentioned a third party involved, yes, I could tell you who he mentioned.

On redirect, the prosecution probed the same material, seeking to establish that

Koenderman's recall of his itinerary and whereabouts that day was sound; the following

exchange took place:

> Q.     You were asked on cross examination as to whether you ever left the precinct
>        with Nayquan Miller in the morning of February 14th of 2004.  You remember
>        those questions?
>
> A.     Yes.
>
> Q.     Who was directing you to the locations, you remember?
>
> A.     Nayquan Miller.
>
> Q.     Where'd you go?
> . . .
> A.     Brookville Park [where the victim's body was dumped]
>
> Q.     Where else did you go?
>
>        (Objection interposed and overruled)
>
> A.     We went to Brookville Park, Springfield Park [where the physical evidence was
>        burned] and then to [petitioner's] address.

Koenderman was not re-crossed, and at the close of his re-direct, the trial court again

issued a cautionary instruction in emphatic language:

> The Court has allowed the People to introduce evidence regarding
> alleged statements made by the co-defendant Nayquan Miller.  I
> now instruct you that although this Court has allowed you to hear
> testimony regarding these statements, these statements have not
> been and are not admitted for their truth.  That is, they have not
> been admitted for the purpose of establishing what happened
> before, during or after the murder in this case.  These statements
> are not in evidence for that purpose and may not be considered by
> you to prove what happened during the crime.  Instead, jurors, the
> Court has allowed the People to introduce evidence regarding the
> alleged statements of [Miller] to rebut the defendant's testimony
> and the defendant's contention that his own statements were

> coercively obtained and derived from [ ] Miller's statement. The
> evidence has been offered for that purpose alone and no other.
>
> Therefore, jurors, I charge you that you may not and must not
> consider the evidence of the alleged statements of [Miller] to
> establish the truth of what is contained in those statements. That,
> is, to establish what happened during the murder. I charge you,
> jurors, that you may consider the evidence of the alleged
> statements made by [Miller] for the purpose of rebutting the
> defendant's claim that his own statement was coercively derived
> and obtained from the statements allegedly made by [ ] Miller.

The trial court repeated this instruction verbatim during its final charge to the jury.

To recap: petitioner's specific claim is that his confrontation clause rights were violated

(i) when rebuttal witness Koenderman was permitted to testify about the differences between

Miller's and petitioner's confessions; (ii) when the prosecutor was permitted to elicit, during the

cross-examination of petitioner, the fact that Hendrickson told petitioner during the interrogation

that Miller had implicated him; and (iii) when the prosecution elicited from Koenderman, on

redirect, the fact that it was Miller who led the police to petitioner's home.

## B.    Controlling Standards

The law in this area is quite clear. On the one hand, the state may not offer, *for their*

*truth*, any portions of the statements Miller made to police that directly or indirectly inculpate

petitioner. See Bruton v. United States, 391 U.S. 123 (1968). On the other hand, "[t]he

[Confrontation] Clause does not bar the use of testimonial statements for purposes *other* than

establishing the truth of the matter asserted." Crawford v. Washington, 541 U.S. 36, 60 n. 9

(2004). Accordingly, as the Supreme Court squarely held in Tennessee v. Street, 471 U.S. 409,

414 (1985), the admission of a non-testifying co-defendant's confession does not implicate the

confrontation rights of the trial defendant when offered for a non-hearsay purpose.

14

In the Crawford era, the Supreme Court has twice reaffirmed the rule of Tennesse. See Crawford, 541 U.S. at 59 n.9 ("[t]he [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," citing Tennessee, 471 U.S. at 414); Michigan v. Bryant, __ U.S.__, __, 131 S. Ct. 1143, 1161 n. 11 (Feb. 28, 2011) ("the Confrontation Clause is not implicated when statements are offered 'for purposes other than establishing the truth of the matter asserted,'" quoting Crawford, 541 U.S. at 59 n.9). See also United States v. Logan, 419 F.3d 172, 177 (2d Cir. 2005) (applying Tennessee and concluding that admission of alibi statements of non-testifying co-conspirators through officer's testimony did not violate Confrontation Clause because statements were offered not to prove truth of matter asserted but to corroborate defendant's own statement that conspirators were planning to use baseball game as alibi, and fact that defendant was aware of alibi), cert. denied, 546 U.S. 1110 (2006); Reyes v. Ercole, No. 08 CV 4749 (JFB), 2010 WL 2243360, at *9 (E.D.N.Y. June 1, 2010) (holding that testimony by two detectives alluding to out-of-court statements that presumably implicated petitioner did not violate Confrontation Clause because they "were used to explain the background of petitioner's confession and to rebut the defense argument that detectives had coerced the confession," relying on Tennessee and Logan).

C.    Analysis

The principal branch of petitioner's claim, challenging Koenderman's comparison of petitioner's and Miller's confessions, is factually on all fours with Tennessee v. Street and readily disposed of on that basis.

In Tennessee, in the murder trial of Harvey Street, the principal piece of evidence was Street's detailed confession to the crime. But Street claimed the confession was "a coerced imitation" of the confession previously given by co-defendant Clifford Peele.   471 U.S. at 415.

Steele specifically testified that when interrogating him, Sheriff Papantoniou first read aloud to him from Peele's statement and then told him to confess to essentially the same thing. On rebuttal, Papantoniou was permitted to read Peele's confession and to then highlight for the jury the differences between Peele's and Street's statements. The trial court instructed the jury that the confession was not admitted for its truth but solely to rebut Street's coerced imitation claim. Id. at 411-12

The Supreme Court held that "[t]he *nonhearsay* aspect of [the accomplice's] confession—not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed—raises no Confrontation Clause concerns." Id. at 414 (emphasis in original). The Court elaborated:

> The Clause's fundamental role in protecting the right of cross-examination . . . was satisfied by Sheriff Papantoniou's presence on the stand. If [Street's] counsel doubted that Peele's confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination [Street's] counsel could also challenge Sheriff Papantoniou's testimony that he did not read from Peele's statement and direct [Street] to say the same thing. In short, the State's rebuttal witness against [Street] was not Peele, but Sheriff Papantoniou.

Id. (internal citations omitted).

The Court further explained:

> The State's most important piece of substantive evidence was [Street's] confession. When [Street] testified that his confession was a coerced imitation, therefore, the focus turned to the State's ability to rebut respondent's testimony. Had the prosecutor been denied the opportunity to present Peele's confession in rebuttal so as to enable the jury to make the relevant comparison, the jury would have been impeded in its task of evaluating the truth of respondent's testimony and handicapped in weighing the reliability of his confession. Such a result would have been at odds with the Confrontation Clause's very mission-to advance the accuracy of the truth-determining process in criminal trials.

Id. at 415 (internal quotation and citation omitted).

The factual similarity between petitioner's challenge to Koenderman's testimony and what occurred in Tennessee—and, therefore, the constitutionality of that testimony—speaks for itself.

Petitioner nevertheless urges that certain differences between his trial and Harvey Street's require a different result here but the Court concludes that those differences are immaterial. Petitioner appears to argue, first, that his testimony, unlike Harvey Street's, did not make an *explicit* a claim of coerced imitation, but that fact is of no consequence because he unquestionably implied as much when he testified that he sat silently while Hendrickson, with Miller's statement before him, wrote a statement for him to sign. Further, the distinction between explicit and implicit coerced imitation claims that he seeks to draw does not have any discernible relevance to the holding and reasoning of the Supreme Court in Tennessee. The critical fact is that Koenderman's testimony was offered for the non-hearsay purpose of rebutting the claim that petitioner advanced.

Petitioner's other attempt to distinguish his case from Tennessee asserts that even if he was advancing a claim of coerced imitation, he was not relying on that theme *exclusively*. Once again petitioner is raising a red herring, for nothing in Tennessee requires that a claim of coerced imitation be the defense's *only* attack on a confession before rebuttal of the type that occurred here may occur. In the language of 2254(d), the Court concludes that the state court's rejection of petitioner's efforts to distinguish Tennessee on such hairsplitting grounds is not an objectively unreasonable application of the holding of that case.[7]

---

[7] When ruling on the state's application to allow Koenderman to testify about the differences between Miller's and petitioner's confessions, the trial court stated, "I have allowed this evidence pursuant to . . . *Tennessee versus Street*. This is what we have been kicking around all day." The Appellate Division did not cite Tennessee but did conclude that "[t]here is no merit

Likewise, the state court's rejection of the other two branches of petitioner's confrontation clause claim does not reflect an unreasonable application of Tennessee or any other Supreme Court holding to which petitioner has called the Court's attention.[8]

It is not objectively unreasonable to conclude that the fact that Hendrickson told petitioner that Miller had implicated him was offered and admitted for a legitimate nonhearsay purpose within the meaning of Tennessee, i.e., "not to prove what happened at the murder scene but to prove what happened when [petitioner] confessed." 471 U.S. at 414. On direct, petitioner advanced the hedged assertion that he was aware of the existence of Miller's statement but that he did not know what was in it; the prosecution was certainly entitled to rebut, or at least test, that assertion. It is not objectively unreasonable to conclude, therefore, that what Hendrickson told petitioner (that Miller had implicated him) went to petitioner's state of mind during the confession, a subject that petitioner himself placed at issue.

For the same reasons, it would not be objectively unreasonable to conclude that the fact that Miller led the police to petitioner's home was offered and admitted for the non-hearsay purpose of rebutting the defense's attempt to show that Koenderman's recollection of the day in question was unreliable.

---

to [petitioner's] contentions that his rights to confrontation and a fair trial were violated when the trial court allowed the People to elicit hearsay statements that a nontestifying codefendant had made to a detective." Bryant, 39 A.D.3d at 768. The court determined that "defense counsel opened the door to such testimony" and that "the testimony at issue was not received for its truth, but, rather, to rebut the testimony of the defendant that his own confession was coercively derived." Id. The court also noted that "the jury was pointedly instructed by the court twice that the '[t]estimony is not being admitted for the truth,' and the jury is presumed to have followed such admonition." Id.

[8] Although the Appellate Division appears to have focused on the branch of the confrontation clause claim involving Koenderman's comparison of the two confessions, see note 6, the appellate court also concluded that petitioner's "remaining claims [were] without merit," Bryant, 39 A.D. 3d at 768, so the entirety of petitioner's claim was "adjudicated on the merits" within the meaning of section 2254(d).

There remains the fact, however, that unlike Koenderman's comparison of the two confessions, neither of these other two challenged portions of testimony was the subject of a specific instruction expressly advising the jury to *consider* the testimony only for the non-hearsay purpose for which it was admitted.[9] Although there is room to debate whether the issuance of a limiting instruction was essential to the holding of Tennessee, the Court did recite that the jury in that case "was pointedly instructed" on non-hearsay use.  471 U.S. at 414.

Accordingly, rather than engage the debate, and assuming without deciding that a limiting instruction as to the non-hearsay use of these two other challenged portions of testimony was required to avoid a confrontation clause error at petitioner's trial, the Court concludes that habeas relief is nevertheless not warranted because any conceivable flaw was harmless.  See generally Kotler v. Woods, 620 F. Supp. 2d 366, 394 (E.D.N.Y. 2009) (explaining that violations of the Confrontation Clause are subject to harmless error analysis) (collecting cases); Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (holding that in a federal habeas proceeding, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict") (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

The Court notes, at the outset, that the prosecutor did not exploit the testimony for its *hearsay* use; *i.e.,* during summation, when arguing petitioner's guilt, the prosecutor did not make specific reference to either the fact that Hendrickson told petitioner that Miller had implicated him or to the fact that it was Miller who led the police to petitioner.  Rather, in the context of arguing that petitioner "lied under oath . . . when he was talking about the manner in which his statements were obtained," the prosecution recounted petitioner's claim and argued

---

[9] To be sure, the court's instruction at the close of the examination of Koenderman, because it refers generally to the fact that the court "had allowed the People to introduce evidence regarding alleged statements made by the co-defendant Nayquan Miller," arguably embraces all of the challenged testimony, but the context makes clear that it was addressed to Koenderman's comparison of the two confessions.

that it made no sense to believe that, after "the detectives told [him] that Miller had given him up," petitioner's response was to refuse to answer any questions. Tr. at 1152-53.[10] (The summation contains no reference at all to the fact that Miller led the police to petitioner's home). More generally, it is inconceivable that the two challenged portions of testimony had a substantial and injurious effect on the verdict rendered by the jurors who not only heard the state's overwhelming case but also had the opportunity to form their own first-hand assessment of petitioner's credibility as he offered a countervailing version of events.

In sum, no portion of petitioner's Confrontation Clause claim is a basis for habeas relief.


## III. THE SENTENCING CLAIMS

### A. New York Penal Law §70.25

Petitioner asserts that the imposition of consecutive sentences for robbery and intentional murder violates Section 70.25 of the New York Penal Law. Section 70.25 provides, in pertinent part, that "[w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other," the sentences "must run concurrently." N.Y. Penal Law §70.25[2]. Petitioner argues that the theory upon which he was convicted was that the robbing and killing of the victim were inseparable and

---

[10] Petitioner also makes a frivolous due process claim on the basis of this remark. Specifically, he claims that by questioning his assertion that he refused to respond to Hendrickson, the prosecution was improperly commenting upon his invocation of his right against self-incrimination. See generally Doyle v. Ohio, 426 U.S. 610 (1976) (holding that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment"). As the record and context make clear, however, the prosecution was not making the impermissible Doyle argument, namely that petitioner's invocation of his right to remain silent should be held against him, but rather that petitioner *did not remain silent*. The Appellate Division's rejection of this claim was not objectively unreasonable.

occurred simultaneously, and that Section 70.25[2] therefore required that the robbery and *both* the felony and intentional murder sentences run concurrently.

The Appellate Division rejected this claim, Bryant, 39 A.D.3d at 769, and that ruling is not reviewable here because petitioner is not challenging the statute's constitutionality; whether the state statute was properly applied in his case raises only a state law question, which is not cognizable on habeas. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

In any event, petitioner's claim under Section 70.25 of the Penal Law is frivolous.   In essence, petitioner is challenging, as "contrary to the record," the sentencing court's finding that the robbing of Huang Chen was complete before the killing of him began, and thus that the crimes of robbery and intentional murder were separate and distinct.  Specifically, that court:

> finds that the trial evidence established that the act of causing the
> death of Huang Chen was [a] separate and distinct act from the
> robbery that was committed. Here, the evidence established that
> the repeated stabbing and beating of the helpless victim occurred
> after Mr. Chen had already surrendered his money to [petitioner]
> and his accomplices. In fact, [petitioner's] own confession
> demonstrates that the murder of the victim was separate and
> distinct from the robbery. [Petitioner] stated that he picked up the
> money that the victim had surrendered and then while his
> accomplices continued to beat the victim, [petitioner] turned up the
> volume on the radio so that no one would hear what was going on.
> [Petitioner] also stated that he, too, intentionally stabbed the
> victim.
>
> Not only did [petitioner's] statement show that the murder of
> Huang Chen was a separate act from the robbery, [petitioner's]
> actions support the same conclusion . . . [petitioner] and his
> accomplices continued to beat and stab the victim after the robbery
> was completed . . . they also tied him up in plastic, put him in the
> trunk of a car and then disposed of his body . . . These actions most
> certainly bespeak those of an intentional murder committed for the
> purpose of silencing a potential witness or for another heinous

> purpose. Therefore, based upon the evidence the Court finds that the murder was not necessary to the commission or completion of the robbery but was an intentional act done for the purpose of permanently silencing a potential witness or for the single purpose of killing. Accordingly, the Court finds that the intentional murder of Huang Chen was separate and distinct from the robbery notwithstanding that they were part of a continuous course of conduct.

People v. Bryant, Ind. No. 606/04. Mem. Dec. (Queens Supreme, May 16, 2005) at 4-5.

The Court rejects as frivolous petitioner's challenge to the soundness of these findings. As the sentencing court makes clear, the principal portion of the trial record showing that the intentional murder occurred after the robbery was complete is petitioner's own confession. The state appellate court, when it rejected petitioner challenge to these findings, concluded that, "[a]lthough the conviction arose out of a single transaction, the record demonstrates that the robbery of the victim was separate and distinct from the subsequent act of killing the victim." Bryant, 39 A.D.3d at 769.[11]  In sum, this Court finds that the state court's view of the record neither was neither an unreasonable application of Supreme Court holdings nor "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" within the meaning of 28 U.S.C. § 2254(d)(2).

Petitioner's Section 70.25 claim also asserts procedural error. That is, apart from challenging the substance of the sentencing court's findings, petitioner also argues that, because section 70.25 speaks in terms of "elements" and "offenses," it requires an elements-based, rather

---

[11] Additionally, although petitioner does not claim here on habeas that the evidence was legally insufficient to establish his guilt of intentional murder in the second degree, he did make that claim on his direct appeal. The Appellate Division ruled that petitioner had failed to preserve the claim for appellate review but also denied the claim in an alternative ruling on the merits. See Bryant, 39 A.D.3d at 768 ("In any event, viewing the evidence in the light most favorable to the prosecution . . . we find that it was legally sufficient to establish that [petitioner] intended to cause the death of the victim.") (internal citations omitted). The court explained that "[h]ere, intent can be inferred from [petitioner's] conduct and the surrounding circumstances." Id. at 769.

than a factual, analysis.  He specifically argues that when considering the appropriateness of imposing consecutive sentences, the court was not free to take account of the entirety of the trial evidence.

This claim is frivolous.

As to what the sentencing court may properly consider, the New York Court of Appeals has made clear that, while Section 70.25 does require courts to *begin* by "examin[ing] the statutory definitions of the crimes," the state "may yet establish the legality of consecutive sentencing by showing that the 'acts or omissions' committed by defendant were separate and distinct acts" and that in making the showing, the state "may offer facts from the trial record where there has been a trial." People v. Laureano, 87 N.Y.2d 640, 643, 644 (1996).  This is precisely what occurred at petitioner's sentencing.  See People v. Bryant, Ind. No. 606/04. Mem. Dec. (Queens Supreme, May 16, 2005) at 4 (applying "the two-step analysis enunciated in" Laureano).  In addition, the competing elements-based analysis that petitioner offers, and on which he relies in arguing that the consecutiveness of the robbery and intentional murder sentences was unlawful, is irrelevant because it is addressed to the relationship between *felony* murder and robbery.

**B.    <u>Due Process</u>**

Resting on the same assertions as petitioner's claim regarding Section 70.25 of the Penal Law is a separately labeled claim that he was denied due process.  Petitioner specifically asserts that a sentence based on a finding not supported by the record violates the rights protected by the Due Process Clause.  The record does not make clear whether petitioner exhausted this claim but in any event it is not a basis for habeas relief.  This Court's conclusion that there was an

23

ample factual basis for the sentencing court's finding that the robbery and intentional murder were separate and distinct crimes entirely disposes of the due process claim as well.

**C.**   ***Apprendi***

Finally, petitioner claims that the imposition of consecutive sentences violates <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), because the finding on which consecutiveness was based (*i.e.,* that the intentional murder occurred after the robbery was complete) was not made by a jury or established by proof beyond a reasonable doubt.

The Appellate Division rejected the <u>Apprendi</u> branch of petitioner's challenge to his sentence as "unpreserved for appellate review." <u>Bryant</u>, 39 A.D.3d at 769. The record shows that petitioner failed to comply with New York's contemporaneous objection rule because he did not advance an <u>Apprendi</u>-based objection before the sentencing court. Because the state appellate court explicitly invoked this defect, the <u>Apprendi</u> claim is procedurally defaulted and may not be considered by this habeas Court. <u>See generally</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991) (explaining that claims are procedurally barred from habeas review if rejected in state court on independent and adequate state-law procedural grounds); <u>Garvey v. Duncan</u>, 485 F.3d 709, 711 (2d Cir. 2007) (holding that New York's contemporaneous objection rule is a "firmly established and regularly followed state law" and thus qualifies as "independent and adequate state law ground").

The Court notes that the state appellate court proceeded to find, "in any event," that the <u>Apprendi</u> claim was "without merit" because, in its view, the sentencing court "did not engage in any fact-finding, but instead made a legal determination based on facts already found by the jury." <u>Bryant</u>, 39 A.D.3d at 769. The fact that the Appellate Division reached the merits in the alternative does not remove the procedural bar. <u>See</u> <u>Harris v. Reed</u>, 489 U.S. 255, 264 n.10

(1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding . . . as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.").

A habeas court may review a procedurally defaulted claim if a petitioner demonstrates both cause for his failure to have exhausted, and prejudice as a result of the court's non-review of, the claim, or that there would be a fundamental miscarriage of justice if the claim is not reached.  See Coleman, 501 U.S. at 750.  In an effort to show the requisite cause and prejudice, petitioner advances an ineffective assistance of counsel claim.  He previously submitted this claim to the state courts, as he is required to do, see Murray v. Carrier, 477 U.S. 478, 488-91 (1986), where  it was rejected on the merits.  See Bryant, 39 A.D.3d at 769 ("The defendant received the effective assistance of counsel.").

To establish ineffective assistance of counsel, petitioner has to show both that counsel's performance was deficient, and that the deficient performance prejudiced him.  Strickland v. Washington, 466 U.S. 668, 687 (1984). This Court readily concludes that petitioner did not suffer Strickland prejudice because the Apprendi claim that he faults counsel for failing to raise is meritless.

The Supreme Court in Apprendi held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  There is no dispute that petitioner's sentences for robbery and intentional murder do not exceed the prescribed statutory maximums for those crimes, see Penal Law § 70.02, so there was no Apprendi violation.  See Webb v. Walsh, 2010 WL 2985879, at *6 (E.D.N.Y. July 23, 2010) (rejecting Apprendi challenge to consecutive sentences for murder and attempted murder

25

because neither of the individual sentences exceeded the statutory maximum for the corresponding count of conviction).

Moreover, although the Apprendi decision itself does not speak to the question of consecutiveness in sentencing, the Supreme Court squarely addressed the matter in Oregon v. Ice, 555 U.S. 160, 129 S. Ct. 711 (2009), which involved an Apprendi challenge to the Oregon statute that provides that sentences shall run concurrently unless the judge finds certain statutorily described facts.  See Ore.Rev.Stat. § 137.123(1).  The question before the Court was, "[w]hen a defendant has been tried and convicted of multiple offenses, each involving discrete sentencing prescriptions, does the Sixth Amendment mandate jury determination of any fact declared necessary to the imposition of consecutive, in lieu of concurrent, sentences?"  Oregon, 555 U.S. at 163.  The Supreme Court held that the Sixth Amendment "as construed in Apprendi and [its progeny] . . . does not exclude Oregon's choice."  Id. at 164.  The Court emphasized that the rationale of Apprendi (i) is offense-specific and thus does not apply to the relationship between sentences for multiple offenses, and (ii) is "rooted in the historic jury function," whereas "[t]he historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently."  Id. at 163, 168.

In sum, because the Apprendi claim lacks merit, petitioner was not prejudiced by counsel's failure to raise it, and thus the Appellate Division's rejection of petitioner's ineffective assistance of counsel claim was not an unreasonable application of Strickland.  For these reasons the Apprendi claim remains procedurally barred.  In any event, for the reasons just discussed, the Appellate Division's alternative, merits-based rejection of petitioner's Apprendi claim is not an unreasonable application of the holdings in Apprendi and Oregon.

## CONCLUSION

For all the foregoing reasons, the application for a writ of habeas corpus is denied and the petition is dismissed.  Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith.  Coppedge v. United States, 369 U.S. 438 (1962).  The Clerk of the Court is directed to close this case.


SO ORDERED.

Dated: Brooklyn, New York
        September  ∕ , 2011

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge